S16A1353. BUFORD v. THE STATE.
(793 SE2d 91)

BENHAM, Justice.

After conducting a bench trial, the trial court found appellant Norman Buford guilty but mentally ill for the shooting death of Willie

---

Archer and the aggravated assault of Orantes Dishmond.[1] For the reasons set forth below, we vacate the sentencing order in part and otherwise affirm.

1. Appellant's chief complaint is that the trial court failed to find him not guilty by reason of insanity. In Georgia, a defendant is presumed to be sane and, as such, a defendant asserting an insanity defense has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed. See *Avelo v. State*, 290 Ga. 609 (3) (724 SE2d 377) (2012). On appeal,

> [t]he applicable standard of review is whether after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime.

(Citation and punctuation omitted.) *Fuss v. State*, 271 Ga. 319, 320 (1) (519 SE2d 446) (1999).

(a) The evidence viewed in a light most favorable to upholding the verdict shows that on July 1, 2003, Dishmond, who was the boyfriend of appellant's daughter, drove to appellant's house along with his friend Archer in order to take appellant's daughter to work. Dishmond parked his vehicle and honked his horn. Appellant came out of his house with a shotgun and shot into the vehicle, killing Archer, a man whom appellant had never met. Appellant asserted voices had told him to "do it." Appellant waived his right to a jury trial and gave notice he was pursuing an insanity defense. The trial court held an evidentiary hearing to determine whether it would accept a plea of not guilty by reason of insanity.

---

[1] On August 26, 2003, a Richmond County grand jury indicted appellant on charges of aggravated assault (Dishmond), malice murder (Archer), felony murder (Archer; aggravated assault), and possession of a firearm during the commission of a crime. Since appellant waived trial by jury, a "not guilty by reason of insanity hearing" was held on May 16, 2005. On June 13, 2005, the trial court rendered its verdict finding appellant guilty but mentally ill on all charges. The trial court erroneously sentenced appellant to life in prison for both malice murder and felony murder. The trial court sentenced appellant to ten years to be served consecutively for the aggravated assault of Dishmond and five years to be served consecutively for possession. Appellant filed a motion for new trial on July 7, 2005, and amended the motion through newly appointed appellate counsel in April 2009. On April 23, 2009, the trial court held a hearing on the motion as amended and denied the motion on May 4, 2009. Appellant filed a notice of appeal on June 4, 2009 and, on September 28, 2009, this Court dismissed the resulting docketed appeal for being untimely. See Case No. S09A2046. Several years later, in 2015, appellant moved pro se for an out-of-time appeal, and his current appellate counsel filed another motion for out-of-time appeal on July 31, 2015. On August 10, 2015, the trial court granted the motion for out-of-time appeal, and appellant filed a timely notice of appeal on August 28, 2015. The case was docketed to the April 2016 term of this Court and submitted for a decision on the briefs.

The hearing transcript shows Dr. Simon Sebastian testified about his forensic evaluation of appellant. It was Dr. Sebastian's opinion that, at the time of the shooting, appellant was suffering from schizophrenia. Dr. Sebastian testified appellant had auditory hallucinations at various points of his life beginning when he was in middle school and continuing through the time of the incident. Dr. Sebastian stated appellant's auditory hallucinations would "flare up" during periods of stress and then subside. Sometimes appellant could resist what the voices told him to do and sometimes he acted on what the voices were telling him to do. In the 1990s, appellant sought psychiatric treatment and was prescribed medication which he stopped taking because he did not like to take pills. There was no evidence appellant had been prescribed or took any medication for his mental health at any other time prior to the shooting. Shortly before the incident, appellant had been laid off from his job and was not working. He had also stopped taking his diabetes and hypertension medications, and his family members reported associated mood swings. In June 2003, appellant visited a psychiatrist at the veteran's hospital,[2] but was not diagnosed with any mental disorder and was not prescribed any medicine. Three days before the incident, appellant called a veteran's hospital helpline to complain of confusion and memory loss, and a nurse admonished him to go to the emergency room, but he did not do so. After appellant was arrested, he was given anti-psychotic medication, and the auditory hallucinations ceased, although he did experience some visual hallucinations.

During the forensic evaluation, appellant told Dr. Sebastian he had been playing with his grandchild when he heard the victim's car horn, and he then became irritated, heard a voice or voices telling him to "do it," and ultimately could not resist the voices.[3] Appellant said he did not feel he was under threat and said he did not know why he did what he did. Dr. Sebastian believed appellant did not know what he was doing was wrong because the actions occurred in broad daylight and because appellant lived right next door to a facility at which police officers had their vehicles repaired.[4] However, Dr. Sebastian also testified as follows:

> Did he know right from wrong? It's very hard to tell and
> for the fact that there's a very short span of time that he went

---

[2] Appellant is a former Marine.

[3] The record shows that before retrieving his gun, appellant told his daughter and grandchildren to go to another room.

[4] After the shooting, no one had to call the police because they heard the gunshots and arrived on scene on their own accord.

from playing with his grandchild to this action and then back to being very cooperative and following directions from, you know, the police officers.

Dr. Sebastian believed appellant was delusional, but was equivocal as to whether appellant's actions were justified given any delusion from which he was suffering:

> Q: [W]ould, in the defendant's min[d], his acts have been justified given the delusion he was suffering from?
> A: I don't know if it would have been justified.

In addition to Dr. Sebastian's live testimony and forensic report, the record included the report of Dr. Deborah D. Gunnin, who examined appellant to determine whether he was competent to stand trial. In her pretrial evaluation, she concluded as follows:

> In the opinion of the examiner, at the time of the alleged offenses, the defendant was suffering from symptoms of a mental disorder. However, an opinion cannot be formed by this examiner with a reasonable degree of psychological certainty regarding the mental capacity of the defendant to distinguish right from wrong in relation to the alleged acts, or regarding whether he suffered from a delusional compulsion that overmastered his will to resist committing the alleged act.

In support of her conclusion, Dr. Gunnin noted there was no information clearly indicating whether appellant knew right from wrong or indicating he was suffering from a delusional compulsion that overmastered his will, in particular because appellant said he did not know why he acted the way he did other than stating that voices told him to "Do it. Do it."

Appellant also testified at the plea hearing and admitted he committed the offenses listed in the indictment. On the day in question, appellant said he was hearing voices, but stated he did not know why he shot the victims and agreed he had no justification for doing so. Appellant confirmed that since taking medication while in jail, he no longer hears the voices.

(b) In Georgia, there are two theories through which a defendant may establish insanity. He may prove that, at the time of the acts alleged, he "did not have [the] mental capacity to distinguish between right and wrong" pursuant to OCGA § 16-3-2 and/or he was suffering from "a delusional compulsion as to such act which overmastered his

will to resist committing the crime" pursuant to OCGA § 16-3-3. "When a delusional compulsion is the basis of an insanity defense, the delusion must be one that, if it had been true, would have justified the defendant's actions." (Footnote omitted.) *Boswell v. State*, 275 Ga. 689, 690-691 (1) (572 SE2d 565) (2002). In this case, appellant could not articulate the particulars of any delusion from which he was suffering that would have justified his actions and so he could not establish insanity pursuant to OCGA § 16-3-3. And so, in this case, the main issue the trial court was tasked with deciding was whether appellant had the mental capacity to distinguish right from wrong.

In *Fuss*, supra, this Court stated:

> The fact that a person is schizophrenic or suffers from a psychosis does not mean he meets the test of insanity requiring a verdict of not guilty on the basis of insanity. The trial court, sitting as the trier of fact, [is] not compelled to accept the testimony of [the defendant's] psychologist, but [is] authorized to find proof of [the defendant's] criminal intent based upon the testimony of the [experts and evidence presented], as well as the words, conduct, demeanor, motive and other circumstances connected with [the defendant's] acts.

(Citation and punctuation omitted.) 271 Ga. at 320 (1). Here, the record shows Dr. Gunnin was uncertain as to whether appellant knew right from wrong and Dr. Sebastian believed, somewhat equivocally, appellant did not know right from wrong. Both experts agreed, however, that appellant was suffering from a mental impairment at the time of the crimes. In these circumstances, appellant did not prove he was legally insane by a preponderance of the evidence, and the trial court was not required to accept Dr. Sebastian's opinion over the opinion of Dr. Gunnin. Id. The evidence was sufficient to support the trial court's verdict finding appellant guilty but mentally ill. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *Fuss v. State*, 271 Ga. at 320.

2. Appellant complains the prosecutor misstated certain facts and that the trial court relied on said misstated facts to arrive at the verdict. In support of this enumeration of error, appellant points to the following colloquy which transpired between the prosecutor and appellant:

> Q: Did you know you were supposed to be taking your medicine?

A: Yeah.
Q: Were you taking your medicine then?
A: No.
Q: Why not?
A: I just stopped taking it. I went off — just stopped taking it.
Q: And it was your choice that you weren't taking your medicine though, right?
A: Yes, it is.
Q: Nobody kept it away from you, did they?
A: No.
Q: It was your decision?
A: Right.
Q: Since you've been incarcerated have you been having to take your medicine?
A: Yes.
Q: What's happened to the voices?
A: They have subsided. I don't hear them.

Appellant also points to the following argument by the prosecutor:

> [Appellant] has a history in his life of not taking the medications that he is supposed to and the ultimate downside of that is we have a family with a murdered relative.

As to his assertion the trial court relied on the prosecutor's purported misstatement of facts, appellant points to the following statement made by the trial court at the close of the plea hearing:

> These are very serious charges and it's so unfortunate that we're at this point where there has been a death and a serious assault on our community. The evidence is not disputed that Mr. Buford for a long period of time has been suffering from some form of mental illness and has been treated for it. It's unfortunate that on the day in question that he was not on his medications and this happened. And he was not taking his medications because, according to his testimony, he did not want to. And that's so unfortunate.

At the sentencing hearing, the trial court also stated:

> It is very unfortunate that this terrible tragedy occurred. I do recall from the testimony that was presented during the course of the bench trial, the fact that you had been on

medications and for some reason were not taking the medications when this occurred. That's unfortunate.

We find appellant's arguments to be of no moment. Notably, appellant never raised an objection as to the prosecutor's original colloquy or argument to the trial court and so any error related to any purported misstatement of facts made by the prosecutor has not been preserved for review. See *Watson v. State*, 289 Ga. 39 (5) (709 SE2d 2) (2011). Although appellant is correct appellant was not prescribed and thus was not taking any medicine for his mental health during the period of time leading up to the shooting,[5] there was evidence in the record that in the 1990s he was treated for his psychological problems with prescribed medication, but he stopped taking it. The record evidence also showed appellant generally did not take medication and was unwilling to seek treatment for his mental health problems. Just a few days before the events at issue, appellant complained to a veteran's hospital hotline about experiencing memory loss and confusion, and the responding nurse instructed him to go to the emergency room, but appellant did not do so. The evidence also showed appellant's family members reported that, a short time before the events at issue, appellant had stopped taking his diabetes and hypertension medication. Thus, given the totality of the evidence showing appellant had a history of not taking his medication as prescribed and had a history of failing to obtain mental health assistance, we do not conclude the verdict turned on any purported misstatement of facts by the prosecutor. There is no reversible error.

3. The trial court erroneously sentenced appellant to life in prison for both malice murder and felony murder. See *Nix v. State*, 280 Ga. 141 (2) (625 SE2d 746) (2006); OCGA § 16-1-7. Accordingly, the judgment of conviction and the life sentence for felony murder must be vacated. *Nix*, supra, 280 Ga. at 142. See also *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993).

*Judgment affirmed in part and vacated in part. All the Justices concur.*

DECIDED NOVEMBER 7, 2016.

*David S. Klein*, for appellant.

---

[5] In fact, appellant had never been diagnosed with schizophrenia until he was examined by Dr. Sebastian after his arrest and before trial.

*Ashley Wright, District Attorney, Joshua B. Smith, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.